IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Thomas J. D'Angelo,<br><br>  Petitioner,<br><br>vs.<br><br>Dora Schriro; State of Arizona Attorney General,<br><br>  Respondents. | No. CIV 04-1006-PHX-MHM (DKD)<br><br>**REPORT AND RECOMMENDATION** |

TO THE HONORABLE MARY H. MURGUIA, UNITED STATES DISTRICT JUDGE:

  Thomas J. D'Angelo filed a timely, fully exhausted petition for writ of habeas corpus on May 18, 2004, challenging his convictions for attempted first-degree murder and burglary, and the trial court's imposition of concurrent seventeen-year prison terms. In his federal petition, he alleges several claims of ineffective assistance of both trial and appellate counsel, and due process violations as a result of an erroneous instruction and insufficient evidence to support the burglary conviction. On February 3 and February 6, 2006, the Court conducted an evidentiary hearing on D'Angelo's claims of ineffective assistance of counsel. Respondents contend that the state court's dismissal of his five ineffective assistance claims was consistent with clearly established Supreme Court precedent enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). In addition, Respondents argue that D'Angelo conceded premeditation by claiming self-defense, and that there was sufficient evidence before the jury that D'Angelo entered or remained in the victim's house unlawfully. For the reasons stated below, the Court recommends that his petition be denied and dismissed with prejudice.

# FACTUAL HISTORY

The facts supporting D'Angelo's convictions are summarized in the state court of appeals memorandum decision:

> Defendant and Gail F. were involved in a ten-month romantic relationship that concluded in late November 1998. The relationship ended when Gail reunited with her former boyfriend, Les, upon Les's release from prison. Gail then began living with Les at the home he shared with his mother, Nanci.
>
> On the afternoon of December 19, 1998, Gail and her friend, Susan, went to Defendant's residence to retrieve some of Gail's belongings and talk with Defendant. Susan testified at trial that, after Gail left, Defendant was crying and commented that "he should just kill Les and get it over with."
>
> Later that day, Les called Gail from a bar and asked her to drive him home. As she did so, they got into an argument, which continued after Les and Gail returned home. The argument escalated into a physical confrontation in which Les slapped or kicked Gail.
>
> Les left the house. Upon stepping outside, he encountered Defendant standing behind a wall in the yard. Les also noticed another man, who was later identified as Defendant's friend, Dave, sitting in a Corvette parked by the house. Defendant, who was holding a gun in his hand, said, "[J]ust tell me that you didn't hit her." Fearing that Defendant might shoot him, Les lied, telling Defendant that he did not hit Gail. He also told Defendant that he was "through with Gail." Before Defendant left with Dave in the Corvette, he thanked Les, stating, "You know, Gail just means so much to me. She makes my house a home." Once Defendant and Dave had gone, Les walked to a bar several blocks away.
>
> Susan later picked Gail up near Nanci's house and drove her to Defendant's house. Apparently at Gail's request, Defendant and Dave returned to Nanci's house to retrieve Gail's belongings. While there, Defendant asked Nanci whether Les had hit Gail. Nanci told Defendant that Les had kicked Gail, to which Defendant responded, "Well, it's never going to happen again."
>
> Defendant and Dave were unable to take all of Gail's property in one trip. Nanci told the men that she would see to it that Gail got the remainder of her things, and she told them not to come back.
>
> Ignoring Nanci's request, the men returned to her house a third time. This time, Les was there. According to Les, Defendant and Dave pulled up in front of Nanci's house immediately after he returned home. Defendant stepped out of the car and said, "Let's finish this, [expletive]," to which Les responded, "Let's rock." Defendant, who was armed with two guns, then fired one of them into the air.
>
> Upon seeing Defendant fire the gun, Les retreated into the house, hoping to escape out the back. Defendant followed and fired a second shot inside the house. Les heard Nanci scream, and he believed that Defendant had

- 2 -

>shot her. Unsure of Defendant's location in the house, Les grabbed a gun from a bedroom, stepped into the hall and began firing toward the living room in an attempt to frighten Defendant into leaving. Les fired the gun until it was empty.
>
>When Les ran out of bullets, Defendant shot him several times, causing him to fall to the ground. Defendant then walked down the hall, stood over Les, and fired several more rounds at close range. As Defendant stood over him, Les said, "[J]ust kill me." Defendant responded, "Do you want to die, punk?" He then knelt down, pointed the gun at Les's face and pulled the trigger. The gun, however, did not fire. Defendant then reached into his coat, drew out his other gun, and shot Les two more times. After shouting obscenities at Les and kicking him in the head, Defendant left. On his way out of the house, he apologized to Nanci.
>
>Despite being shot between eight and ten times, Les survived and later testified against Defendant at trial. Defendant admitted shooting Les with two separate guns but maintained that he had done so in self-defense. The jury rejected Defendant's self-defense claim and convicted him of the offense charged.

(Doc. #8, Exh A at 2-5).

## DIRECT REVIEW

On appeal, D'Angelo argued two issues: (1) the definition of premeditation given to the jury was unconstitutional because it relieves the State of its burden of proving actual reflection in attempted first-degree murder cases; and (2) the trial court erred in denying his motion for judgment of acquittal on the burglary charge because the State presented insufficient evidence to support the jury's finding that D'Angelo was in the victim's house without permission. In rejecting D'Angelo's claim of an erroneous instruction, the court of appeals found that premeditation was not a contested issue at trial, because the jury was presented with an "all or nothing defense": "[e]ither Defendant was guilty of attempted first-degree murder or he was not guilty because he acted in self-defense" (Doc. #8, Exh A at 7). The Court concluded that because any error in the instruction did not deprive D'Angelo of a right essential to his defense, there was no fundamental error (*Id.*). In finding sufficient evidence to support the burglary conviction, the court of appeals rejected D'Angelo's claims that he had permission from Gail to be in the residence, in order to pick up her belongings, and that Les had invited him into the house immediately before the shooting (*Id.* at 9). The

court of appeals reasoned that "[e]ven accepting as true Defendant's claim that Gail had the authority to permit him to enter the residence to remove her property, his actions far exceeded the purpose for which Gail allegedly had given him permission to enter the house" (*Id*. at 9-10). In addition, the court of appeals decided that because the victim's account of the incident contradicted D'Angelo's testimony that he entered the residence with the victim's permission, substantial evidence existed to support the State's theory of the case, allowing the issue to be submitted to the jury "to determine which theory was more credible" (*Id*.)

## POST-CONVICTION PROCEEDINGS

In his counseled Rule 32 proceedings, D'Angelo contended that both trial counsel and appellate counsel were ineffective. He argued that trial counsel failed to properly investigate the case, including the failure to hire a ballistics expert to contradict the state's expert, and the failure to interview and subpoena witnesses for trial. He also argued that trial counsel failed to raise the alternative defense of defense of others. He contended that appellate counsel was deficient for failing to raise the issue of prosecutorial misconduct or argue abuse of discretion in limiting inquiry into the victim's prior conviction, and failing to argue fundamental error due to the trial court's delivery of erroneous jury instructions (*Id*., Exh E). In rejecting these claims, the trial court ruled as follows:

> The defendant's petition now claims that his trial counsel rendered ineffective assistance. Defendant's claims as to trial counsel's lack of investigation, failure to employ a ballistics expert, or to present a justification defense are all without merit. In each claim, there is mere speculation as to whether these actions by counsel could have had any effect on the outcome. Defendant's counsel at trial had clearly investigated the case thoroughly and had interviewed all necessary witnesses. Defendant offers mere speculation as to possible "other" witnesses. Similarly, the claims as to ballistics experts must fail for lack of information as to what the ballistic expert would testify to. The affidavit submitted by counsel in her reply makes claims which are inconsistent with the evidence at trial as the basis for its speculation. Just as speculative are the defendant's claims of ineffective assistance by appellate counsel. In each of the separate areas discussed, the defendant has failed to show that the Court of Appeals would have had a different ruling if the presentation of other arguments had been made. Appellate counsel used his best judgment in selecting arguments most

- 4 -

>likely to succeed. Those not selected had no possibility of success because of existing Arizona law.

(*Id.*, Exh F).

## EVIDENTIARY HEARING

The Court conducted an evidentiary hearing on D'Angelo's claims of ineffective assistance of counsel.[1] The five claims presented in his petition are as follows: (1) failure to properly investigate the case or to retain and call a ballistics expert; (2) failure to raise the alternative defense of defense of others; (3) failure to raise the issue of prosecutorial misconduct on appeal; (4) failure to raise the issue of the trial court's improper limitation on the defense inquiry into the victim's prior conviction; and (5) failure to raise the issue of the trial court's improper jury instruction. Counsel for D'Angelo began by withdrawing the claim of failure to raise the alternative defense of defense of others.

The first witness, Dr. Edard William Love, Jr., retained by D'Angelo, testified that he had reviewed police reports, and transcripts of the testimony of the victim, D'Angelo, the investigating detective, and the firearms examiner for the Phoenix crime lab, along with the examiner's notes and report. Based upon a review of these exhibits, he submitted a preliminary report to counsel. In his report, he concluded that the investigation was "lacking." He testified that he would have collected and analyzed an unrecovered bullet fragment, the .22 revolver and the cartridge cases. He would have conducted a trajectory analysis, to determine the position of the shooter and/or the victim. He would have testified as an expert as to the direction of the bullet strikes, in contrast to what he termed Detective Boyd's "unqualified opinion." He testified that he would have used the "proper" terms in making a conclusion in a ballistics analysis, in contrast to the State's expert. He would have

---

[1] As the Court stated at the beginning of the evidentiary hearing, the lack of a complete state court record was the primary reason for the order setting an evidentiary hearing. The Court made clear to the parties that had the state court record been provided to the Court as an appendix to the Answer, instead of the day before the evidentiary hearing, the hearing most likely would not have been necessary.

- 5 -

conducted a distance determination by testing the firearm, and not by viewing gunpowder particles on the victim's clothing, as the State's expert did. If hired as a defense expert, he testified he would have done more than review the notes and report of the State's expert.

On cross-examination, he admitted that he did not review certain medical reports or police reports; that no ballistic forensic examination would determine whether an individual made a statement, or pointed a gun at somebody, or accidentally or intentionally fired a shot; that the failure to recover certain evidence from the crime scene is the responsibility of the detectives at the scene; and that he didn't know whether the results of the various tests he would have conducted would have helped D'Angelo's case at all.

D'Angelo also testified at the evidentiary hearing. He stated that he had told his attorneys to interview the bartender at the bar where the victim was just before coming home, the cab driver who drove him home and dropped him off two blocks before the house, other people at the bar, and D'Angelo's firearms instructor. He also testified that these individuals would have supported his claim of self-defense, and that counsel did not interview them. He also stated that both attorneys told him that he didn't need a ballistics expert; that it wasn't necessary because everything was "going fine" with the case. He also verified that the trial court offered the parties a brief continuance to allow defense counsel to hire their own expert, as a sanction for the late disclosure of the state expert's report, and that both counsel declined the offer because one was going back in the army and the other had surgery scheduled. Finally, he testified that he requested that appellate counsel raise issues contained in the motion for new trial and the issue of prosecutorial misconduct, but appellate counsel did not do so. He admitted on cross-examination that he also opposed a continuance of the trial date, and communicated this to counsel. He also admitted that appellate counsel had explained to D'Angelo in a letter that he was not going to raise the jury instruction claim on appeal because it was harmless error.

One of D'Angelo's trial attorneys testified at the hearing. She testified as to the actions taken by the investigator hired by the defense. She also testified that prior to trial, the only

- 6 -

information about the victim's whereabouts prior to the incident came from the police report and the interview conducted in the hospital, both of which indicated that he had left the house and walked to a parking lot, and made a phone call. It was only during the victim's testimony at trial that she learned that he had walked to a bar and taken a cab home. She also testified that the defense produced both eyewitness testimony and evidence of physical injuries as evidence of an abusive relationship between the victim and his girlfriend, to show the violent nature of the victim after he had been drinking, especially showing his jealousy about his girlfriend, and his violent nature in general.

Regarding her decision not to call David Zarra as a witness at trial, she explained that he was not a witness to the incident, that he made inconsistent, contradictory statements about what had happened the night of the incident, and that he also made several comments to the police that he thought D'Angelo was going to flee. She also explained that she was able to elicit testimony about the victim's behavior earlier that evening from other witnesses. She testified that when the state untimely disclosed their expert's report, she asked that it be excluded. When the trial judge offered to continue the trial to allow the defense to hire its own expert, she explained that she was scheduled to go in the Army, her co-counsel had surgery scheduled, and that D'Angelo told co-counsel that he had been in custody a long time and wanted to get on with the trial. So the trial judge continued it two days to allow the defense to have their own expert evaluate the state expert's report. She testified that initially the defense's main concern was to disprove the state's theory that the victim had been shot in the back. After interviewing their own expert, who concluded that the state expert's conclusions were reasonable, she said they decided not to call him as a witness, but that he did provide cross-examination questions for the state's witness. The defense concluded that there was nothing their own expert could do for the case that couldn't be accomplished through cross-examination of other witnesses.

Regarding the trajectory analysis, defense counsel testified that once the victim testified, his testimony and the victim's mother's testimony corroborated the defense theory

1  as to where the victim and defendant were standing during the first encounter: there was no
2  dispute that the victim was down the hallway near his bedroom and D'Angelo was in front
3  of the house. Any further forensic examination would not have disclosed any different
4  conclusion. She testified that the issues regarding the second encounter included whether
5  D'Angelo fired the gun while he was standing over the victim, which gun was used, and how
6  many shots were fired. Because the state did not know of the existence of a second gun,
7  defense counsel was not going to disclose that information with any further ballistics
8  evidence.

9        When questioned by counsel for Respondents, defense counsel testified that the
10 parties stipulated to the victim's intoxication on the night of the shooting, and that she
11 brought out testimony from other witnesses that the victim became quite violent when he was
12 drunk. Because she didn't have information that the victim was drinking throughout the night
13 until after he testified, she stated that she had no reason to interview patrons and/or a
14 bartender at an unknown bar, or the cab driver who drove him home just prior to the
15 shooting. She admitted that as part of her argument for discovery sanctions as a result of the
16 late disclosure of the state's expert, she argued that had the defense known of the report, it
17 would have hired its own expert, and that it was at a distinct disadvantage without a ballistics
18 expert. However, she stated that based on the facts she knew at the time, if given another
19 opportunity, she would not have hired a ballistics expert.

20       Appellate counsel also testified at the hearing. With twenty years experience as a
21 criminal appellate attorney, he described the process of reviewing the state court record to
22 identify any legal errors, deciding which issues to raise and the respective burdens of proof.
23 He testified that he raised two claims on appeal: that the trial judge misdefined
24 premeditation, and that there was insufficient evidence to support the burglary count.
25 Regarding D'Angelo's specific claims of ineffective assistance of appellate counsel, counsel
26 testified that he didn't raise the trial court's limitation on the defense inquiry into the victim's
27 prior conviction for aggravated assault because the victim's character was impeached, the
28

evidence of his prior conviction was before the jury, and D'Angelo testified that he fired the gun accidentally, which indicated that the confrontation did not begin because of any vicious disposition on the part of the victim.

D'Angelo also claimed that appellate counsel should have raised the issue that the jury was improperly instructed that he was charged with both aggravated assault and attempted murder. Counsel testified that he did not raise the issue because the jury effectively got the instruction the same way they would have if it had been a lesser included offense, and in any event the trial judge dismissed the aggravated assault, so there was no error. He also testified that to the extent counsel wanted to investigate the jury verdicts further, it would be a proper post-conviction issue, which the trial court could find precluded if it was prematurely raised on appeal. Finally, D'Angelo argued that counsel should have raised the issue of prosecutorial misconduct. Counsel testified that he did not raise the issue because he saw no persistent, repetitive pattern of misconduct.

The state's expert also testified as to the forensic firearms examination conducted in D'Angelo's case and the review of his notes by the defense's expert. He was asked to examine casing and slugs to determine the type of gun, the ejection projectile for the type of gun, and the projection pattern. He did an approximate distance determination. The defense expert testified as to the steps he took to review the state expert's notes and report. He was asked to do a limited evaluation of the state expert's file and to determine, assuming that the examination conducted by the state's expert was accurate, whether the report he provided was appropriate. After his limited review of the expert's file, he concluded that the report and its conclusions appeared to be appropriate.

## ANALYSIS

A review of the state court record and the testimony at the evidentiary hearing indicates that D'Angelo has failed to meet either requirement set out in *Strickland*. Nothing in either the record or the testimony at the hearing provides any support for his claim that either trial counsel or appellate counsel's performance was deficient. Starting with the

1 presumption of adequate performance, D'Angelo has not shown that either counsel's
2 performance contained errors so serious as to constitute a denial of the Sixth Amendment
3 right to counsel. *Strickland*, 466 U.S. at 687. Second, he has not shown prejudice: that but
4 for the unprofessional errors of counsel, there is a reasonable probability that the outcome
5 would have been different. *Id*. at 694.

6 The Court agrees with the state court's conclusions concerning D'Angelo's claims of
7 ineffective assistance of counsel. The trial court ruled that "[i]n each claim, there is mere
8 speculation as to whether these actions by counsel could have had any effect on the
9 outcome." The ballistics expert who testified at the evidentiary hearing admitted on cross-
10 examination that he could not say that any of the tests he believed should have been
11 conducted - distance determination, trajectory analysis, examination of bullet strikes - would
12 have assisted D'Angelo's case. The trial court also ruled that "[d]efendant's counsel at trial
13 had clearly investigated the case thoroughly and had interviewed all necessary witnesses.
14 Defendant offers mere speculation as to possible 'other' witnesses." This was confirmed by
15 counsel's testimony at the evidentiary hearing. She first learned of the victim's presence at
16 a bar right before the shooting when he testified at trial. Whatever speculative testimony
17 these witnesses might have provided would have been cumulative at best. Several other
18 witnesses had already testified as to the victim's intoxication, and the parties stipulated to it
19 as well.

20 Regarding appellate counsel's performance, the trial court ruled that "defendant has
21 failed to show that the Court of Appeals would have had a different ruling if the presentation
22 of other arguments had been made." Defense counsel testified at the evidentiary hearing that
23 she believed there was prosecutorial misconduct that occurred during the course of the trial.
24 The record reflects that subsequent counsel indeed based his motion for new trial in part on
25 this issue. However, appellate counsel did not see a persistent, pervasive pattern, and for that
26 reason declined to raise the issue on appeal. D'Angelo never refuted this conclusion, in
27 either his state court proceedings, or before this Court.

28

The trial court ruled that "[a]ppellate counsel used his best judgment in selecting arguments most likely to succeed. Those not selected had no possibility of success because of existing Arizona law." Appellate counsel testified that the trial court's ruling on the victim's "sanitized" prior conviction was not likely to be successful as an example of reversible error because the victim's character was impeached, the evidence of his prior conviction was before the jury, and D'Angelo testified that he fired the gun accidentally, which indicated that the confrontation did not begin because of any vicious disposition on the part of the victim. D'Angelo never rebutted this analysis, in either his Rule 32 proceedings, or before this Court. Finally, his claim that appellate counsel should have raised the issue of erroneous jury instructions is also without merit. The record reflects that the jury was polled as to their verdicts, negating any claim that they may have been confused by the instructions. The trial court properly dismissed the aggravated assault conviction, so D'Angelo suffered no prejudice. Finally, appellate counsel pointed out that had he raised the issue on appeal, it would have been rejected as more properly brought in a Rule 32 proceeding, and possibly later found precluded in such a proceeding.

D'Angelo's two remaining claims are also without merit. As the court of appeals correctly ruled, premeditation was not a contested issue at trial, because the jury was presented with either finding D'Angelo guilty of attempted first-degree murder or not guilty because he acted in self-defense. Because any error in the instruction did not deprive D'Angelo of a right essential to his defense, the court of appeals correctly found no fundamental error. In finding that there was sufficient evidence to support the burglary conviction, the court of appeals properly rejected D'Angelo's claims that he had permission to be in the residence, because even assuming that someone not living in the house had the authority to permit him to enter the residence, his actions far exceeded the purpose for which she allegedly had given him permission to enter the house. In any event, because the victim's account of the incident contradicted D'Angelo's testimony that he entered the residence with the victim's permission, the court of appeals decided that substantial evidence existed to

support the State's theory of the case, allowing the issue to be submitted to the jury for their determination of which theory was more credible.

**IT IS THEREFORE RECOMMENDED** that Petitioner Thomas J. D'Angelo's petition for writ of habeas corpus be **DENIED** and **DISMISSED WITH PREJUDICE** (Doc. #1).

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See*, 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(e), Federal Rules of Civil Procedure. Thereafter, the parties have ten days within which to file a response to the objections. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See* Rule 72, Federal Rules of Civil Procedure.

DATED this 21st day of June, 2007.

_____
David K. Duncan
United States Magistrate Judge

- 12 -